**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

FILED

AUG 1 4 2014

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

**LISA LYNN SPARKS,**

       **Plaintiff,**

**v.**                                        **Civil Action No. 2:14CV16**
                                             **(The Honorable John Preston Bailey)**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

**REPORT AND RECOMMENDATION/OPINION**

Lisa Lynn Sparks ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

**I. PROCEDURAL HISTORY**

Plaintiff protectively filed an application for DIB on February 11, 2011, alleging disability since January 3, 2008, due to "limited use of right hand, nerve damage in right elbow"[1] (R. 145-46, 168). Plaintiff's application was denied initially and upon reconsideration (R. 81, 94). Plaintiff requested a hearing, which Administrative Law Judge Jeffrey P. La Vicka ("ALJ") held on November

---

[1] In his decision, the ALJ found that while Plaintiff had been diagnosed with anxiety and an affective disorder, they were not severe impairments. (R. at 13-14.) In her brief, Plaintiff has only presented arguments regarding her physical limitations. Accordingly, the undersigned has focused solely on Plaintiff's medical records concerning her physical limitations, not mental limitations, for the relevant time period.

1, 2012. Plaintiff, who was represented by counsel, Justin White, testified on her own behalf. Also testifying was Vocational Expert ("VE") Rabia Rosen (R. 29-58). On November 8, 2012, the ALJ entered a decision finding Plaintiff was not disabled (R. 11-23). On December 27, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-3).

## II. STATEMENT OF FACTS

Plaintiff was born on March 25, 1971 and was forty-one (41) years old on the date of the administrative hearing (R. 21, 33). She earned her high school diploma (R. 39). Plaintiff's past relevant work includes lumber grader and pizza shop worker (R. 169).

On January 9, 2006, Plaintiff saw Dr. Richard Topping with complaints of right shoulder and right thumb pain. She had experienced no prior shoulder complaints. Plaintiff's pain was in her superior lateral shoulder, and it occasionally radiated into her neck. Plaintiff had "occasional mild numbness and tingling in her right hand, much less so than what she had in her contralateral limb." Plaintiff's right thumb pain was atraumatic and had been present since March 2006. The pain was on "the radial side of her wrist and the base of the thumb and thenar as well." Plaintiff experienced rare numbness and tingling. Plaintiff treated her pain with Ibuprofen; she had discussed a splint with another provider but the splint was out-of-stock. She had not tried physical therapy (R. 370).

On examination, Dr. Topping noted that Plaintiff's right shoulder elevated to 160 degrees, externally rotated to 65 degrees, and internally rotated to T12. This was "symmetrical to the contralateral unaffected side." There was a "slight click in the superior aspect of her shoulder with internal and external rotation with the shoulder abducted." Plaintiff had a negative drop arm test, positive impingement, positive apprehension, positive relocation, a negative speed test, and a negative sulcus sign. Her right wrist and hand had tenderness over its first dorsal compartment. Plaintiff had

normal Allen's testing, a positive Finkelstein, a mildly positive thumb grind, a positive Tinel's sign over the median and ulnar nerve at the level of the wrist, and no thenar or hyper thenar atrophy. Dr. Topping took X-rays of her right shoulder and thumb. He noted that these X-rays demonstrated "what appears to be normal bony structure and alignment." Dr. Topping assessed shoulder tendinitis and de Quervains with possibly some mild carpal tunnel involvement. He recommended physical therapy "emphasizing strength of the scapula stabilizers and rotator cuff." If Plaintiff's shoulder did not improve he would recommend "injecting her glenohumeral joint followed by bursa for diagnostic and therapeutic purposes." He placed a thumb spica splint on Plaintiff and noted that he would see her "as necessary" (R. 370).

On January 26, 2006, Plaintiff had an initial evaluation at the Elkins Physical Therapy and Sports Injury Clinic. She was diagnosed with right shoulder tendinitis. Plaintiff complained of constant pain in her right shoulder and right thumb. She described her pain as being at an eight (8) or nine (9) on a ten (10)-point scale, and that she experienced burning or stabbing pain. Heat helped to reduce her pain (R. 292). Physical therapist R. Weller determined that Plaintiff would be seen three (3) times per week for six (6) to seven (7) weeks to work on decreasing her pain and increasing her range of motion and strength (R. 290).

Plaintiff saw physical therapist C. Shoemaker on February 1, 2006. She reported that her shoulder continued to hurt because of continued work and repetitive activity. Physical therapist Shoemaker noted that Plaintiff had tightness, restriction, and some pain with flexion of her shoulder. The next day, Plaintiff reported that her shoulder pain was continuing but had not gotten any worse. Physical therapist Shoemaker noted a small click with rotation of her shoulder (R. 290). On February 3, 2006, Plaintiff complained of some pain that was not as severe as the day before. Physical therapist Shoemaker noted that Plaintiff had tightness in her upper trapezius muscle. She had decreased pain,

but inflammation was present in her tendon (R. 289).

Plaintiff returned for physical therapy on February 9, 2006. She complained of having a stiff neck over the weekend and reported that she did not do many exercises. Her shoulder was not as sore as it was the previous week. Physical therapist Shoemaker noted that Plaintiff had a normal range of motion with minimal pain. Plaintiff tolerated her exercises well and reported a decrease in pain and an increase in strength. The next day, Plaintiff reported having less shoulder pain, but she was tired from working a fourteen (14)-hour shift at work. After examining Plaintiff, physical therapist Shoemaker noted that Plaintiff did have less pain in her shoulder with activity and work, but was definitely fatigued from work (R. 289).

On February 20, 2006, Plaintiff told C. Shoemaker that she had been off work since the previous Tuesday due to her husband and son being sick. Her shoulder had not hurt at all since them. Plaintiff reported feeling "very good." Physical therapist Shoemaker noted that rest had helped decrease Plaintiff's inflammation and had given her "pain-free function." Two days later, Plaintiff continued to report that her shoulder was "doing well." She was returning to work the next day. After therapy, physical therapist Shoemaker noted that Plaintiff was progressing better and that her strength was increasing. Plaintiff had a decrease in inflammation in her tendon. On February 24, 2006, Plaintiff reported that she did "fair" at work on her first day back, but that she had lifted "heavy wide boards" and that her shoulder was "killing" her (R. 288).

Plaintiff returned to physical therapy with C. Shoemaker on March 2, 2006. She reported that her shoulder had been hurting "a lot" since going back to work. Physical therapist Shoemaker encouraged Plaintiff to continue to work on increasing her strength and to control inflammation in her shoulder by icing it. A week later, Plaintiff reported that her shoulder had been feeling "much better lately." C. Shoemaker noted that Plaintiff had normal range of motion and strength and a decrease in

4

inflammation. Plaintiff could return to full working status with no restrictions (R. 287).

Plaintiff saw Dr. Topping on November 5, 2007 for "more and more problems with her hands, left slightly worse than right." Plaintiff also reported that she had been off work "the last several months for migraines" but had "about a six month history of increased symptoms again." She had tried using wrist splints with Advil, Motrin, and Naprosyn to reduce her pain. Plaintiff also reported having some problems with her right shoulder and neck. On examination, Dr. Topping noted that Plaintiff was in acute distress. Plaintiff's hands had no thenar or hypothenar atrophy. She had normal Allen's testing. Plaintiff's Tinel's sign was "markedly positive over the median nerve at the level of the wrist, negative at the elbow." Her ulnar nerve was negative at the wrist and elbow. Plaintiff had "increased numbness in her median nerve distribution after 5 seconds bilaterally." Dr. Topping assessed recurrent worsening carpal tunnel syndrome that had been present "off and on" since 2001. Plaintiff chose to use a splint and to take vitamin B6. Dr. Topping referred her for EMG nerve conduction studies and, depending on those findings, he would discuss the possibility of carpal tunnel release surgery with Plaintiff (R. 328, 369).[2]

On January 31, 2008, Plaintiff presented to the emergency room at Davis Memorial Hospital with complaints of right wrist pain after falling (R. 306). She stated that her pain was mild to moderate. Upon examination, Plaintiff was in no acute distress and was alert. She had tenderness in her right hand. Her wrist was non-tender and had a normal range of motion (R. 308). While at the hospital, Plaintiff underwent an X-ray of her right wrist. The X-ray showed "no evidence for acute fracture and no abnormalities of alignment and no foreign bodies." Dr. Frederick Gabriele's

---

[2] An Addendum to Dr. Topping's treatment notes indicates that Plaintiff had left carpal tunnel release surgery performed in 2001. She never had surgery on her right wrist. Plaintiff "initially did well" but now had "episodes of recurrence" (R. 328, 369).

impression was for an "[u]nremarkable right wrist" (R. 311). Staff applied a Velcro splint to Plaintiff's wrist and discharged her with a prescription for Lortab (R. 307).

Plaintiff saw PA Alicia Harper at Dr. Topping's office on February 4, 2008 for an evaluation of her right wrist. Most of Plaintiff's pain was localized "over the ulnar aspect of her wrist." She also had swelling over that area. Plaintiff complained of "some pain over her thumb and into her scaphoid." On examination, PA Harper noted that Plaintiff had tenderness, swelling, and bruising over her ulna. She also had tenderness over her scaphoid and a positive Watson. Plaintiff demonstrated full flexion and extension of her fingers. She had no pain over her scapholunate and was neurovascularly intact. PA Harper assessed a right wrist sprain with possible scaphoid pathology. PA Harper placed a plaster splint on Plaintiff's wrist (R. 327, 351, 368).

On February 14, 2008, Plaintiff returned to PA Harper for a follow-up for her right wrist sprain. Plaintiff complained that she was still experiencing pain in her splint. On examination, PA Harper noted that Plaintiff had tenderness over her scaphoid, a positive Watson, and pain over her ulnar styloid. Plaintiff had full flexion and extension of her fingers. PA Harper noted tenderness over her deQuervain's and a positive Tinel over Plaintiff's superficial radial nerve. She assessed a right wrist fracture with possible scaphoid pathology. Plaintiff was placed in a thumb spica cast (R. 325, 349, 366). That same day, Dr. Topping took X-rays of Plaintiff's right wrist. These X-rays showed "a little bit of proximal widening of her scapholunate interval on the clinched fist. This is only to 3.5 millimeters however." Dr. Topping saw "no obvious fracture" and noted that Plaintiff's "scapholunate interval angulation on the lateral [was] normal" (R. 326, 350, 367).

On March 6, 2008, Plaintiff saw Dr. Topping with complaints of soreness in her wrist. Dr. Topping removed her cast and noted that her wrist had "no erythema, warmth, no deformity." Plaintiff had "about 50% limitation in range of motion in all directions." She had tenderness "over the

snuffbox, volar wrist diffusely." Plaintiff demonstrated no significant dorsal tenderness but had "a little bit" of ulnar tenderness. Plaintiff had a negative clamshell and Watson test. Dr. Topping took X-rays of Plaintiff's right wrist, which showed "3 millimeters of scapholunate space on the clinched fist." He did not see any obvious fractures or other abnormalities. Dr. Topping placed a thumb spica split and directed Plaintiff to start physical therapy. He noted that Plaintiff could be released to work if she was doing better. However, at that time, Plaintiff could not perform any repetitive use of her right hand and remained "temporary total disabled" (R. 324, 348, 365).

Plaintiff saw physical therapist P. Calvert at the Elkins Physical Therapy and Sports Injury Clinic on March 13, 2008. Plaintiff had complaints of a stiff wrist and some numbness in her fingers. P. Calvert noted that she had decreased range of motion and strength because of pain and stuffiness. Plaintiff was to attend physical therapy three (3) times a week for four (4) to six (6) weeks to increase her range of motion and decrease her pain (R. 286, 299).

Plaintiff returned to physical therapy on March 19, 2008. She reported experiencing some improvement. Plaintiff tolerated her exercises well. Two days later, Plaintiff reported that she was "slowly improving." She tolerated her exercises well and noted a decrease in pain. On March 24, 2008, Plaintiff told P. Calvert that her pain had decreased but that she still experienced stiffness in her wrist in the mornings. She tolerated her exercises well and was to continue to work on increasing her strength and range of motion (R. 285, 298). Two days later, Plaintiff reported continued improvement. On March 31, 2008, Plaintiff told P. Calvert that she had noticed a decrease in pain. Three days later, on April 3, 2008, Plaintiff reported that her pain was still decreased and that she was continuing to work on improving her range of motion. She tolerated her exercises well (R. 284, 297).

On April 4, 2008, Plaintiff reported to physical therapist P. Calvert that she had experienced a decrease in pain. She continued to work on strengthening her wrist and improving her range of

motion. Four days later, Plaintiff reported an increase in radial wrist pain along with soreness, even when she was at rest. After her exercises, Plaintiff was "much more sore." She was to decrease her activity until her inflammation decreased. On April 10, 2009, Plaintiff reported that she had decreased pain, but that her wrist was still very sore and that she had increased pain with movement. P. Calvert determined that Plaintiff would continue physical therapy three (3) times per week to increase strength and decrease pain (R. 283, 296). The next day, Plaintiff reported a decrease in pain (R. 282, 295).

On April 14, 2008, Plaintiff told P. Calvert that she was experiencing pain and crepitus in her ulnar wrist. She also stated that she had "TTP in the same area" and that she did better in a splint. P. Calvert continued to work with Plaintiff on range of motion and wrist strengthening. The physical therapist noted that Plaintiff had improved but still was limited by pain, which increased with use of her wrist. Plaintiff was to see her doctor that same day for an evaluation and recommendations (R. 282, 295).

Plaintiff saw Dr. Topping again with complaints of having "quite a bit of trouble with her right wrist" on April 14, 2008. She had been "working hard" in physical therapy. Plaintiff reported that physical therapy gave her temporary relief but then she experienced recurrent pain again. Plaintiff had been unable to return to work. On examination, Dr. Topping found that Plaintiff had no deformity or swelling of her right wrist. Her range of motion had improved. Plaintiff was "maximally tender in her snuffbox and the dorsal scapholunar region." She had no ulnar sided tenderness. Plaintiff had "no clunk but marked pain with the Watson maneuver." She had a positive thumb grind but "negative lunotriquetral shuck, negative clamshell sign." Dr. Topping took X-rays of her wrist, which demonstrated her "scapholunate interval to measure 3.5 millimeters." Plaintiff's angulation on the lateral was normal. Dr. Topping diagnosed a high-grade partial scapholunate injury. He discussed treatment options with Plaintiff and decided to continue conservative care for another month. He

discussed the possibility of arthroscopy with possible pinning (R. 323, 347, 364).

Plaintiff returned to physical therapy on April 18, 2009 and reported that if her pain did not decrease in four (4) weeks, her doctor may consider surgery. P. Calvert continued to work with Plaintiff on grip strength and range of motion. Plaintiff tolerated her exercises well and experienced a decrease in pain (R. 282). On April 29, 2008, Plaintiff reported a decrease in pain and crepitus. Three days later, on May 2, 2008, Plaintiff continued physical therapy with "steady improvement." On May 6, 2008, she told P. Calvert that she was "doing well" and that she did not have any pain. On May 9, 2008, Plaintiff reported a decrease in pain and that she was continuing to progress with activity at home. She was a "bit sore" from washing walls at her house. Plaintiff was to return the following Monday prior to seeing her doctor (R. 281, 294).

On May 12, 2008, Plaintiff told Dr. Topping that she was having "quite a bit of trouble with her right wrist." She complained of dorsal radial pain with "some chronic numbness on the radial border of her thumb." Plaintiff had "off and on again carpal tunnel symptoms but none worse recently." On examination, Dr. Topping noted that Plaintiff was "tender over her scapholunate interval dorsally." She had "a little bit of snuffbox tenderness, no ulnar sided tenderness, negative lunotriquetral shuck, positive thumb grind, positive Watson test for pain but no clunk." Plaintiff had diminished sensation on the radial border of her thumb. Dr. Topping discussed treatment options with Plaintiff, and Plaintiff chose to undergo surgery (R. 322, 346, 363).

Dr. Topping performed an "arthroscopy, percutaneous pinning scapholunate" on Plaintiff on May 28, 2008 at Davis Memorial Hospital. His preoperative diagnosis was for a right wrist sprain. Dr. Topping noted that Plaintiff had a lot of synovitis in her radial carpal tunnel joint. Her scapholunate interval had a partial thickness tear and "some fraying and degenerative changes . . . with a little bit of spreading." He placed three (3) K-wires percutaneously over Plaintiff's scapholunate.

9

Dr. Topping noted "good alignment of the scapholunate with good placement of all hardware." His post-operative diagnosis was for partial thickness scapholunate dissociation right wrist and 3 mm. condyle defect dorsum lunate, nonarticulating (R. 302, 417).

Plaintiff saw PA Harper for a postop of her right wrist scapholunate pinning on June 9, 2008. Plaintiff had no complaints. She started that she occasionally had "intense pain" that shot through her wrist but that she was overall doing well. Plaintiff's stitches were removed. Plaintiff's percutaneous pins were intact and there was no pin tract infection. She had full flexion and extension of her fingers. Dr. Topping took X-rays. Plaintiff was placed in a thumb spica cast (R. 321, 345, 362).

On July 14, 2008, Plaintiff told Dr. Topping that she was "feeling much better." On examination, Plaintiff's cast was in good repair, her pin sites looked good, and her pins were removed without incident. Plaintiff was "neurovascularly intact distally." Dr. Topping took radiographs of Plaintiff's right wrist. These views showed "some diffuse osteopenia" but "no other obvious abnormality." Dr. Topping noted that Plaintiff was "doing well." Plaintiff was fitted with a splint and was directed to continue "very limited activity with her wrist" (R. 320, 344, 361).

Plaintiff saw Dr. Topping on August 11, 2008. She reported that she was "doing better with her wrist." She still experienced soreness but had been wearing her brace. On examination, Dr. Topping noted that Plaintiff still had some tenderness over her snuffbox and dorsal scapholunate region. He noted some soft tissue swelling but no gross deformity. Dr. Topping took radiographs of Plaintiff's right wrist; these demonstrated "no obvious abnormality at this point." He instructed Plaintiff to gradually increase her activity. He further explained that he would not recommend that Plaintiff return to work "as the repetitive use would most likely cause a significant flare and possibly compromise her result" (R. 319, 343, 360).

On September 24, 2008, Plaintiff had a follow-up with PA Harper for her right scapholunate

percutaneous pinning. Plaintiff complained of having some soreness in the dorsum of her wrist. She also had numbness in the ulnar aspect of her thumb. Plaintiff denied any other complaints other than stiffness. She reported that she had been working on strength with her hand. On examination, PA Harper noted that Plaintiff only had approximately 15 degrees of flexion. Plaintiff could extend to neutral. She had some tenderness over her scapholunate and was neurovascularly intact. PA Harper assessed right wrist scapholunate percutaneous pinning. Plaintiff was directed to wear a brace as needed and to begin working on her range of motion. She wished to attempt physical therapy on her own at home (R. 318, 342, 359).

Plaintiff presented to Dr. Topping on November 7, 2008 with complaints that she was still having "some soreness with her right wrist." On examination, Dr. Topping noted that Plaintiff's motion was improving. She had a 40-degree arc of motion with volar dorsiflexion and had 4/5 grip strength. Plaintiff had "a little bit of tenderness" over her 4/5 portal, "none more radially, no snuffbox tenderness." She was still improving from her scapholunate pining. Plaintiff wanted to continue a home exercise program. Dr. Topping noted that Plaintiff was unable to return to repetitive use yet and explained that she may never be able to return to her work as a lumber grader. Plaintiff wanted to consider her options, and Dr. Topping noted that she was on disability "for the next two months" (R. 317, 341, 358).

Plaintiff returned to see Dr. Topping on January 30, 2009. She complained of "increased problems with her right hand again." Plaintiff had not been able to return to work. Plaintiff had "about a month history of atraumatic onset numbness to her ring and small finger." Dr. Topping noted that Plaintiff had experienced similar symptoms on her left hand "which got better after a carpal tunnel release." Plaintiff often woke up numb. Upon examination, Dr. Topping found that Plaintiff had no tenderness in her wrist and no thenar or hypothenar atrophy. Her range of motion in her wrist was

11

limited by 30%. Plaintiff had normal sensation at baseline and normal Allen's testing. She had a "positive Tinel at the ulnar nerve at the level of the elbow, negative at the wrist, negative over the median nerve at both locations." Plaintiff had a positive elbow hyperflexion test. A Phalen's maneuver caused "a little bit of numbness after 15 seconds in the ulnar nerve distribution as well." Dr. Topping diagnosed ulnar neuritis of the elbow. He instructed Plaintiff to take vitamin B6 as well as an over-the-counter anti-inflammatory and cautioned her to avoid hyperflexed positioning. Plaintiff was to contact Dr. Topping if her symptoms became worse to determine whether she would undergo nerve conduction and EMGs. Dr. Topping discussed "the small chance of surgery, specifically ulnar nerve transposition." He felt that it was "within a reasonable degree of medical certainty" that Plaintiff would be "unable to return to repetitive motion work environment such as required at Bruce Hardwoods" (R. 316, 340, 357).

On April 28, 2009, Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti determined that Plaintiff could occasionally lift and carry twenty (20) pounds; frequently lift and carry ten (10) pounds; stand, walk and sit for about six (6) hours in an eight (8)-hour workday; and was unlimited in pushing and pulling (R. 330). Plaintiff could never climb ladders, ropes, and scaffolds, but could occasionally climb ramps and stairs, balance, stoop, knee, crouch, and crawl (R. 331). Plaintiff had limitations in reaching in all directions, including overhead; handling; fingering; and feeling. Dr. Franyutti noted that Plaintiff was occasionally limited with reaching and lifting with her right upper extremity, and that she also experienced "numbness of fingers & difficulty with gross and fine manipulation" with her right hand. Plaintiff's use of her left upper extremity was unlimited (R. 332). Dr. Franyutti determined that Plaintiff should avoid concentrated exposure to extreme heat and cold and vibration, and even moderate exposure to hazards (R. 333). He noted that Plaintiff appeared to be credible (R. 334).

Plaintiff returned to see Dr. Topping on July 6, 2009 with "some problems with her right hand." She reported that she had been doing better after taking vitamin B6. Over the weekend, Plaintiff had experienced some pain in "her ulnar sided wrist and the ring and small finger." However, Plaintiff's pain was better. On examination, Dr. Topping noted that Plaintiff's right had no erythema, warmth, swelling, or deformity. She had normal sensation distally, normal Allen's testing, and a negative Phalen's. Plaintiff did have a "positive Tinel over the ulnar nerve at the wrist and elbow, negative over the median nerve." Dr. Topping found that she still had some ulnar neuritis symptoms. He instructed Plaintiff to continue her current treatment regimen and to return in two (2) months. He noted that if Plaintiff reported worse symptoms, he would obtain nerve conduction studies and an EMG and would discuss the "small chance of ulnar nerve transposition surgery" with her (R. 339, 356).

Plaintiff completed a Function Report-Adult on August 25, 2009. She described that on a typical day, she got up at 6:00 a.m., fixed breakfast for her son and got him on the school bus, did the dishes, and cleaned around the house. She stated that it took her a while to clean because she would have to take breaks because of pain in her hand. Plaintiff would fix lunch for her daughter and herself. At times, she went to the school to pick up her son from football practice. She attended his football games. Plaintiff went to bed around 10:00 or 11:00 p.m. (R. 205). She cared for her children and husband. Plaintiff's conditions affected her sleep because her hand would go numb and wake her up. She had trouble with buttons when dressing and had to cut her hair to be able to better take care of it (R. 206). Plaintiff prepared meals daily. She prepared sandwiches, hot dogs, canned foods, and sometimes frozen dinners. Plaintiff took a while to peel potatoes and could not do "a lot of stirring." As for housework, Plaintiff did dishes, laundry, and used the vacuum (R. 207). She could not do yard work because her hands hurt too much to use a push mower or weed eater. Plaintiff went outside every

day.  She drove and could go out alone.  It did not take her long to shop in stores.  Plaintiff could pay bills, count change, handle a savings account, and use a checkbook/money orders (R. 208).  Her hobbies included reading and watching television.  Plaintiff spent time with others approximately once or twice a week by visiting family and friends, talking on the telephone, and going to football games (R. 209).  She stated that her conditions affected her ability to lift, reach, use her hands, and complete tasks.  She used a splint, prescribed by Dr. Topping, if her wrist hurt (R. 211).[3]

On September 22, 2009, Dr. A. Przybyla reviewed Dr. Franyutti's Physical Residual Functional Capacity and concurred with same (R. 372).

Dr. Topping referred Plaintiff to physical therapist ("PT") John DiBacco at the Elkins Physical Therapy and Sports Injury Clinic for a functional capacity evaluation ("FCE").  The FCE occurred on January 7, 2010.  Plaintiff reported that she had a "dull pain" in her right shoulder most of the time (R. 419).  Her pain increased with activity.  She experienced an "occasional locking sensation with distant reaching tasks."  Plaintiff was able to reach overhead but experienced increased pain.  She had pain along her anterior shoulder when reaching behind her back.  Plaintiff reported that she had ulnar nerve symptoms when her elbow was resting on a hard surface or flexed for a long period of time.  She felt "carpal tunnel type tingling" in the right hand with a "'pins and needles' type feeling and periodic numbness through the thumb side of the hand."  Plaintiff had limited wrist motion, and she

---

[3] Plaintiff completed another Function Report-Adult on February 23, 2011.  In this report, she added that she spent a typical day doing light cleaning, fixing dinner, reading, watching television, and going outside.  Plaintiff's depression and pain in her arm affected her sleep (R. 236).  Her husband and son helped her do dishes, laundry, cleaning, and cooking (R. 237).  Plaintiff arms fell asleep if she read in bed or sat in a chair (R. 239).  She reported that her conditions affected her ability to lift, reach, concentrate, complete tasks, use her hands, get along with others, and her memory.  In this report, Plaintiff had no problems with walking (R. 240).  She reported that she was sad a lot and got mad and frustrated easily, but that her medications helped with those feelings (R. 241).

experienced pain with extension and radial and ulnar deviation. She had occasional numbness in her thumb and had difficulty bearing weight through her wrist (R. 420).

PT DiBacco conducted an examination of Plaintiff. She had normal sensation to light touch and normal reflexes in her upper extremities. Plaintiff's right wrist was tender to palpation over the snuffbox and over the pin site "with some pain at the base of the 4th metacarpal." She also had tenderness over her distal ulna into the thenar muscles. PT DiBacco noted "tingling into the appropriate peripheral nerve distribution with Tinel's percussion at the wrist and elbow." In Plaintiff's right shoulder, there was "TTP along the anterior shoulder at the greater and lesser tuberosities and along the bicipital groove, extending along the long head of the biceps." Plaintiff had some tightness and tenderness extending to her right upper trapezius. PT DiBacco conducted manual muscle testing and determined Plaintiff had 5/5 strength through her right wrist; decreased strength (4/5) with right elbow extension, pronation, and supination; and decreased strength (4/5) with right shoulder flexion, abduction, internal rotation, and external rotation. Plaintiff experienced pain with "resisted testing of the right shoulder." She had limited range of motion in her right wrist, elbow, and shoulder (R. 420).

As to the occasional material handling portion of testing, Plaintiff was able to lift weights ranging from fifteen (15) to twenty-five (25) pounds. When the weight was placed at floor height, Plaintiff was able to lift twenty (20) pounds by bending forward and twenty (20) pounds using a "squatting type posture." When the weight handles were raised twelve (12) inches above floor height, Plaintiff could lift twenty-two (22) pounds. She could lift twenty-five (25) pounds over a three (3) foot wall and out away from her body. Plaintiff could lift twenty (20) pounds from waist height to shoulder height and nineteen (19) pounds from waist height to overhead. She was able to carry twenty-five (25) pounds for twenty (20) feet using two hands and fifteen (15) pounds when using only her right hand. Plaintiff could push and pull with twenty (20) pounds of force (R. 420).

As to frequent material handling, Plaintiff could handle weights ranging from eleven (11) to eighteen (18) pounds. PT DiBacco noted that as frequency began to increase, Plaintiff "would be unable to perform the shoulder lift or the overhead lift due to pain with repetitive shoulder flexion." Plaintiff did best "with those tasks that do not require distant lifting out away from her body." As to constant material handling, Plaintiff was able to handle weights from five (5) to seven (7) pounds. She was unable to "perform the shoulder height and overhead lifts at this frequency due to pain with repetitive shoulder flexion." She was unable to perform "the barrier lift due to pain with distant reaching to the front" (R. 421).

PT DiBacco further opined that Plaintiff could bend, squat, kneel, sit, stand, walk, and climb stairs on a constant basis. Plaintiff could not climb ladders or crawl because of "pain with weight bearing through the right upper extremity." Plaintiff could frequently reach forward and occasionally reach overhead. She demonstrated good balance. PT DiBacco noted that Plaintiff could operate light arm controls only with her left upper extremity and could operate light leg controls with either lower extremity. Plaintiff had "fair fine motor skills when working with objects several mm in size." "Rapid exchange grip testing showed consistent weakness equivalent to that tested during 5 position testing" (R. 421).

Overall, PT DiBacco found that Plaintiff could perform work at the light exertional level. However, she had "continued limitations on lifting to shoulder height and above as well as difficulty with distant reaching to the front" (R. 421). PT DiBacco opined that he did not foresee Plaintiff improving to a higher exertional level with work conditioning. Plaintiff passed 52/58 validity criteria, equaling 90%. PT DiBacco stated that suggested "excellent effort and valid results which can be used for medical and vocational planning" (R. 422).

Plaintiff saw Dr. Arturo Sabio on March 30, 2011, for a consultative examination. Plaintiff's

chief complaints were for "[p]ain in the right wrist, elbow, shoulder, and depression." She stated that she had experienced depression ever since injuring her right shoulder in 2006. Plaintiff tried physical therapy, which helped her pain improve, but complained that she currently experienced "increasing pains in the right wrist and the elbow" (R. 409). Dr. Sabio noted that Plaintiff had "a left carpal tunnel surgery" and "an open reduction and internal fixation of the right wrist and excision of free floating bone fragments in the wrist" (R. 410).

Upon examination, Dr. Sabio noted that Plaintiff had tenderness in her right wrist, right elbow, and right shoulder. She also had tenderness in her right superior trapezius muscle, left superior trapezius muscle, and over the nape. Her shoulders allowed "100 degrees of abduction on the right side, 180 degrees of abduction on the left side, forward flexion is 160 degrees on the right and 180 degrees on the left." Dr. Sabio noted these restrictions were due to pain and stiffness in her cervical spine and shoulders. Plaintiff's handgrips were measured "at 6 kg of force on the right and 14 kg of force on the left" (R. 411). Dr. Sabio noted that was abnormal because Plaintiff was right-handed and noted "a weak handgrip probably due to the pain in the right wrist and the right shoulder." Plaintiff had normal deep tendon reflexes; could walk on her heels, toes, and heel-to-toe; was able to squat normally; and had normal fine manipulation movements. Dr. Sabio diagnosed Plaintiff with depression; right ulnar neuropathy; right shoulder adhesive capsulitis; and chronic neck strain (R. 412).

Kay Means completed a Physical Residual Functional Capacity Assessment of Plaintiff on April 13, 2011. She found that Plaintiff could occasionally lift and carry twenty (20) pounds; frequently lift and carry ten (10) pounds; stand and walk for about six (6) hours in an eight (8)-hour workday; sit for less than about six (6) hours in an eight (8)-hour workday; and was unlimited with pushing and pulling (R. 64). Plaintiff could never climb ladders, ropes, or scaffolds but could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 65). Ms. Means

determined that Plaintiff was limited in reaching in all directions, including overhead, with her right shoulder. Plaintiff was unlimited in handling, fingering, and feeling (R. 66). Ms. Means found that Plaintiff was partially credible and reduced her physical residual capacity to light (R. 70).

On July 20, 2011, Pedro F. Lo reviewed Kay Means' Physical Residual Functional Capacity Assessment of April 13, 2011 and agreed with same (R. 413).

<u>Administrative Hearing</u>

At the administrative hearing, Plaintiff testified that she had three (3) children. Her oldest was twenty-one (21) and lived outside the home. She also had an eighteen (18)-year old son (R. 35). Plaintiff's youngest child was five (5) months old at the time of the hearing. Plaintiff cared for her son, and her husband and older son helped when they were home (R. 36). Plaintiff would sometimes go for walks and would push her younger son around in a stroller (R. 37). She would take walks with her younger son approximately two (2) to three (3) times per week. Plaintiff drove to doctor's appointments once or twice a week; however, she often had her older son or her husband drive her around (R. 38). She received approximately $1,232.00 per month in long-term disability from Prudential Insurance and had received that since 2008 (R. 39).

Plaintiff testified that she could "not really" work because of her wrist, elbow, and shoulder (R. 41). Plaintiff's most recent job was as a finish line grader. That job involved pulling "anywhere from 2-foot boards to 7-foot boards" and marking defects with a crayon. Plaintiff left that job when she fell and broke her wrist (R. 42). Plaintiff also worked at Little Caesar's as a crew leader. That position involved supervising three (3) or four (4) employees. Plaintiff had not looked for any jobs since she last worked (R. 43-44). She stated that the use of her right arm interfered with her ability to work. She would drop things and could not do the things she once could with her arm, such as lifting and pulling (R. 44).

18

Plaintiff testified that she used her cell phone to talk to her children, her mother, and her husband when he was away (R. 45-46). Plaintiff cooked daily, went shopping once a week, did dishes by hand, did laundry two (2) to three (3) times a week, made beds, and vacuumed two (2) or three (3) times a week (R. 46). When Plaintiff did dishes, she took a break every ten (10) to fifteen (15) minutes depending on how many dishes needed to be washed (R. 47). Those breaks lasted from five (5) to ten (10) minutes. Plaintiff had problems reaching over head because of her shoulder. She testified that when she tried to reach overhead, her shoulder "catches and then it locks on me." Plaintiff's husband or older son would go grocery shopping with her to do the lifting (R. 48). She could lift cans, but could not lift heavier things because she would drop them. Plaintiff testified that she had dropped her glass cookware before, causing it to break. She could lift a gallon of milk and pour it, but she usually used her left hand to do so. Plaintiff experienced numbness and tingling in her right hand. She testified that her ring finger and little finger stayed numb, and that the tingling and numbness went from her elbow to her shoulder. Plaintiff used one finger to type (R. 49).

The ALJ asked the VE the following hypothetical question:

> All right. Assume a hypothetical individual the same age, education, and work experience as the claimant who retains the capacity to perform sedentary work with occasional posturals except no climbing of ladders, ropes or scaffolds, who's limited to occasional overhead reaching with the right arm, who must avoid concentrated exposure to extreme cold and heat, and who must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving. Would such an individual be capable of performing the claimant's past work?

(R. 53.) The VE responded that such an individual could not perform Plaintiff's past work, but could perform the jobs of table worker, with 434,170 jobs nationally and 190 jobs regionally; order clerk, with 216,390 jobs nationally; and quotation clerk, with 973,800 jobs nationally and 290 jobs regionally (R. 53-55).

Plaintiff's attorney asked the VE the following question:

19

Ms. Rosen, if we took the Judge's first hypothetical but added one limitation, adding only occasional handling, fingering, and feeling, as seen in 6F, 14F, and 19F they have hand weight grip and no arm controls with the right arm, but if we were to add the occasional handling, fingering and feeling with just the right arm, would that change your answers for the sedentary jobs available?

The VE responded that such an individual could still perform the jobs of table worker and order clerk

(R. 56).

## III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ LaVicka made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since April 30, 2009, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.  The claimant has the following severe impairments: right ulnar neuropathy and right shoulder adhesive capsulitis/chronic neck sprain (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the work must: entail no climbing of ladders, ropes and scaffolds and only occasional claiming [sic] of ramps or stairs, balancing, stooping, kneeling, crouching and crawling; entail only occasional overhead reaching with the right arm; and avoid concentrated exposure to extreme cold and heat and all exposure to unprotected heights, hazards machinery and commercial driving.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on March 25, 1971 and was 36 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

20

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from April 30, 2009, through the date of this decision (20 CFR 404.1520(g)).

(R. 13-22).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before

a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contentions of the Parties

Plaintiff contends:

1.     The ALJ failed to properly evaluate and weight the medical opinions of record and he erred when he based his RFC finding on his own lay opinion rather than the supported medical opinions contained in the record.

(Plaintiff's Brief at 11-13.)

The Commissioner contends:

1.     Substantial evidence supports the Commissioner's final decision that Plaintiff is not entitled to disability benefits.

(Defendant's Brief at 8-15.)

## C.  Opinion Evidence

Plaintiff only raises one claim for relief.  She asserts that "although the ALJ did discuss all of the medical and non-medical evidence in the record, he did not fully credit any of the medical opinions. After discrediting all of the medical opinions contained in the record, he then impermissibly substituted his own opinion for that of qualified medical sources."  (Plaintiff's Brief at 11.)  Plaintiff specifically focuses on the medical opinions provided by physical therapist John DiBacco, consultative physician Dr. Sabio, and the State agency physicians.  (Id. at 12-13.)

20 C.F.R. § 404.1527(c) states:

*How we weigh medical opinions.*  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling

weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

23

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig, however, the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d at 590. Furthermore, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983).

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977). The Administration has discussed the explanation of the weight to be given to a treating source's medical opinion, as follows:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:
>
> When the determination or decision:
>
> *is not fully favorable, e.g., is a denial; or
>
> *is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability

to function;

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). "[W]hen a physician offers specific restrictions or limitations . . . the ALJ must provide reasons for accepting or rejecting such opinions." Trimmer v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011), aff'd by 2011 WL 4574365 (E.D. VA. Sept. 30, 2011). A logical nexus must exist between the weight accorded to opinion evidence and the record, and the reasons for assigning such weight must be "sufficiently articulated to permit meaningful judicial review." DeLoatch, 715 F.2d at 150.

As to the opinion evidence, the ALJ stated:

> As for the opinion evidence, the undersigned notes, that the claimant underwent two separate consultative examinations, which evidenced some limitations associated with both conditions. First, is the consultative examination performed by John DiBacco, PT, DPT at the request of Dr. Topping in January 2010. Exhibits 14F; 19F. There, Dr. DiBacco found that the claimant had some functional limitations with her right wrist and shoulder. The undersigned notes that Dr. DiBacco found that the claimant's right wrist was tender to palpation over the snuffbox and over the pin site on the carpals with some pain at the base of the 4th metacarpal. She also had tenderness over the distal ulna, into the thenar muscles extending toward the MP joint. She had tingling into the appropriate peripheral nerve distribution with Tinel's percussion at the wrist and elbow. In the right shoulder, there was TTP along the anterior shoulder at the greater and lesser tuberosities and along the bicipital groove, extending along the long head of the biceps. She had some tightness and tenderness extending up into the right upper trapezius. However, manual muscle testing showed 5/5 strength through the right wrist. There was some decreased strength (4/5 MMT) noted with the right elbow extension, with pronation and supination as well as with right shoulder flexion, abduction, internal rotation, and external rotation. Further, there was some limited range of motion noted in the right wrist, elbow and shoulder. Exhibit 19F. Nevertheless, Dr. DiBacco found that upon testing, the claimant could lift weights in the range of 15 to 25 pounds on the occasional material handling portion of the test, 11 to 18 pounds on the frequent handling portion of the test and five to seven pounds on the constant material handling portion of the test. Exhibit 19F. Dr. DiBacco found that the claimant could perform light exertional work overall. He found the claimant

had no limitations with bending, squatting, kneeling, sitting, standing, walking or stair climbing. Exhibit 19F. The undersigned finds that these limitations are well supported by the available evidence, particularly the claimant's lack of treatment of her ulnar neuropathy and right shoulder adhesive capsulitis. Nevertheless, the undersigned has afforded the claimant the utmost benefit of the doubt, limiting her to sedentary work with the above postural and environmental limitations. The undersigned notes that Dr. DiBacco limited the claimant to no crawling, only frequent forward reaching and light arm controls with the left upper extremity only. He also found that she would be able to operate light leg controls with either lower extremity. The claimant demonstrated fair fine motor skills when working with objects several mm in size. Exhibit 19F. The undersigned finds little, if any, objective evidence that would support a finding that the claimant is incapable of performing any crawling or is limited to only frequent forward reaching, particularly in light of her rather extensive activities of daily living that were discussed previously, and her rather limited treatment. Accordingly, the undersigned finds that the limitation contained in the above residual functional capacity more than adequately accommodate [sic] for any limitations the claimant may have with regard to these limitations. Further, the undersigned also finds that there is no available evidence that the claimant is incapable of performing arm controls, bilaterally, or lower extremity leg controls, bilaterally, at the sedentary exertional level. The undersigned finds that the above residual functional capacity also accommodates for any limitations in this regard. As such, the undersigned afford significant, but not great weight to the opinion of Dr. DiBacco. However, the undersigned finds his conclusions with regard to crawling, forward reaching and, to the extent he concluded the claimant could only perform machine controls with the left upper extremity little weight.

As for the March 2011 consultative examination with Dr. Arturo Sabio, M.D., (Exhibit 14F), the undersigned affords his findings some weight as they represent some limitations with regard to the claimant's right ulnar neuropathy and right shoulder adhesive capsulitis. Exhibit 14F. However, Dr. Sabio fails to set forth a residual functional capacity detailing the function by function limitations associated with these conditions. Further, the undersigned notes that many of Dr. Sabio's findings appear to be based upon the claimant's own subjective self reports of tenderness and pain.

As for the State agency consultants' physical assessments at Exhibits 6F and 9F, the undersigned affords those opinions limited weight as they concluded the claimant could perform light exertional work, which given the claimant's relatively limited treatment and few findings upon physical examination by her treating doctors is supported by the available evidence. However, these experts concluded that the claimant's reaching in all directions, handling, finger [sic] and feeling were limited. Such limitations are not wholly supported by the available evidence. The undersigned finds such limitations overstate the claimant's limitations especially in light of the claimant's lack of treatment and the limited findings upon examination detailed in the few records reflecting treatment during the period at issue. Indeed, even Dr. DiBacco, who examined the claimant, did not find limitations as restrictive as those set forth by these experts. Accordingly, the undersigned affords those specific findings wither [sic]

regard to reaching, handling, fingering and feeling little weight. As for the State agency consultant's physical assessments contained in Exhibit 15F, the undersigned affords it some weight. Like those other State agency opinions, it also concluded the claimant could perform light exertional work. However, that expert concluded that the claimant had limitations with regard to reaching in all directions with the right shoulder, but did not have any limitations with regard to handling, fingering or feeling. The undersigned finds that the record certainly does not suggest any limitations with handling, finger [sic] or feeling. However, the undersigned finds that this expert's finding with regard to the claimant's reaching abilities does not sufficiently define said limitation and/or quantify it. The claimant's activities of daily living do not support a finding that reaching in all directions is limited. In fact, the undersigned finds that the limitation of the claimant to occasional overhead reaching more than adequate [sic] accommodates any reaching limitations alleged by the claimant. As noted previously, the claimant has reported no difficulty folding laundry and making beds. Additionally, she cares for her five month old child and takes him for walks, pushing him in a stroller. The undersigned affords no weight to the residual functional capacity assessment contained at Exhibit 10F as it appears incomplete and is unsigned.

(R. at 19-21.)

In her brief, Plaintiff takes issue with the ALJ's rejection of the portions of PT DiBacco's, Dr. Sabio's, and the State agency physicians' opinions concerning her limitations for crawling, using her dominant right upper extremity, reaching, fingering, handling, and feeling. (Plaintiff's Brief at 12-13.) Specifically, Plaintiff states:

While physical therapist John DiBacco's objective functional capacity assessment was consistent with the opinions of the two State agency physicians with regard to Ms. Sparks' limitations in using her dominant right upper extremity, and while all of those reports are also supported by the findings and diagnoses of consultative physician, Dr. Sabio . . ., the ALJ found each one of the opinions to be unworthy of full weight for insupportable reasons. For instance, the ALJ gave the part of Physical Therapist DiBacco's opinion that he agreed with significant weight, but *the part of the opinion that he did not agree with* little weight . . . . In doing so, the ALJ took it upon himself to interpret DiBacco's own objective test results himself, even though the ALJ is in no way qualified to do so, and he then concluded that there was "little to no objective evidence" to support DiBacco's conclusions that Ms. Sparks should do no crawling or use of arm controls due to weakness and pain in her right upper extremity . . . . The ALJ rejected the consistent findings of Dr. Sabio because, he stated, Dr. Sabio based too much of his opinion on Ms. Sparks' subjective complaints . . . when it is clear from Dr. Sabio's report that he based his conclusions on his physical examination of Ms. Sparks . . . . The ALJ rejected the opinions of both State agency physicians that Ms. Sparks was limited to only occasional reaching, handling, fingering and feeling

because they were not "wholly supported by the available evidence" . . . when those limitations were fully supported by all of the other medical opinions and all of the medical evidence of record.

(Id.)

After reviewing the record, the undersigned finds that the ALJ properly rejected PT DiBacco's opinion that Plaintiff could never crawl, could only frequently reach forward, and could only perform machine controls with her left upper extremity. Contrary to Plaintiff's argument, his opinion is not supported by the other medical opinions and medical evidence of record. As to crawling, in his April 28, 2009 Physical Residual Functional Capacity Assessment of Plaintiff, Dr. Franyutti determined that Plaintiff could occasionally crawl (R. at 331) and could occasionally reach in all directions with her upper right extremity (R. at 332). Dr. Przybyla concurred with that finding on September 22, 2009. (R. at 372.) Additionally, Dr. Sabio never found that Plaintiff could never crawl after completing his consultative examination. Furthermore, on April 13, 2011, Kay Means completed a Physical Residual Functional Capacity Assessment of Plaintiff and found that she could occasionally crawl. (R. at 65.) Finally, at no time did Dr. Topping, Plaintiff's primary medical provider, find that Plaintiff had limitations in crawling.

Likewise, PT DiBacco's opinion that Plaintiff could only perform machine controls with her left upper extremity is not supported by the medical evidence of record. Again, at no time did Dr. Topping opine that Plaintiff could never operate such controls with her right upper extremity. On April 28, 2009, Dr. Franyutti found that Plaintiff had no limitations in operating hand controls with both upper extremities. (R. at 330.) Dr. Przybyla concurred with this finding on September 22, 2009. (R. at 372.) Again, Dr. Sabio never found limitations as to Plaintiff's use of her right upper extremity. Furthermore, on April 13, 2011, Ms. Means found that Plaintiff had no limitations in operating hand controls with both upper extremities. (R. at 64.)

As to PT DiBacco's opinion that Plaintiff was limited to frequent forward reaching, his opinion appears to be supported by Ms. Means' April 13, 2011 Physical Residual Functional Capacity Assessment of Plaintiff, in which she found that Plaintiff was limited in reaching in all directions with her right shoulder. (R. at 66.) However, as the ALJ noted, Ms. Means did not detail exactly how Plaintiff was limited in reaching. Furthermore, PT DiBacco's opinion is contradicted by Dr. Franyutti's April 28, 2009 Physical Residual Functional Capacity Assessment of Plaintiff, in which he found that Plaintiff was occasionally limited with reaching and lifting with her upper right extremity again. (R. at 332.)

Likewise, the undersigned concludes that the ALJ properly assigned little weight to Dr. Franyutti's opinion that Plaintiff was limited in handling, fingering, and feeling. At no time during his consultative examination of Plaintiff did Dr. Sabio find that she had limitations with using her hands and fingers; Dr. Sabio even noted that Plaintiff had normal fine manipulation movements. (R. at 412.) Ms. Means determined that Plaintiff had no such limitations in her April 13, 2011 Physical Residual Functional Capacity Assessment. (R. at 66.) Furthermore, PT DiBacco, who personally examined Plaintiff, found that Plaintiff had "fair fine motor skills when working with objects several mm in size." (R. at 421.) In fact, PT DiBacco noted that Plaintiff could use both hands for fine manipulations. (R. at 423.) Furthermore, PA Harper at Dr. Topping's office found that Plaintiff had full flexion and extension of her fingers on February 4 and 14, 2008. (R. at 325, 327, 349, 351, 366, 368.)

The undersigned also finds that the ALJ properly assigned little weight to the portions of these medical opinions given Plaintiff's reported activities of daily living. In a Function Report–Adult completed on August 25, 2009, Plaintiff reported that on a typical day, she fixed breakfast for her son, did dishes and cleaned around the house. Plaintiff also fixed lunch for herself and her daughter. (R.

at 205.) As for housework, Plaintiff also did laundry and vacuumed the house. (R. at 207.) At the administrative hearing, Plaintiff testified that she also took care of her youngest child, who was five (5) months old at that time, during the day. (R. at 36.) She took the baby for walks in a stroller. (R. at 37.) Plaintiff cooked daily, did dishes by hand, did laundry two to three (2-3) times per week, made the beds, and vacuumed two to three (2-3) times per week. (R. at 46.) Given these extensive activities of daily living, the undersigned finds that the ALJ properly assigned little weight to the medical opinions that Plaintiff had limitations in reaching, fingering, handling, and feeling.

Nevertheless, assuming *arguendo* that the ALJ erred in his assignment of weight to these opinions and should have included limitations as to handling, fingering, and feeling in Plaintiff's RFC, "[t]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate disability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); Hurtado v. Astrue, C/A No. 1:09-1073-MBS-SVH, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("[T]he court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision."). As noted above, during the administrative hearing, Plaintiff's attorney asked the VE the following question:

> Ms. Rosen, if we took the Judge's first hypothetical but added one limitation, adding only occasional handling, fingering, and feeling, as seen in 6F, 14F, and 19F they have hand weight grip and no arm controls with the right arm, but if we were to add the occasional handling, fingering and feeling with just the right arm, would that change your answers for the sedentary jobs available?

The VE responded that such an individual could still perform the jobs of table worker and order clerk (R. 56). Indeed, as the ALJ noted in his Step Five decision:

> The undersigned notes that the claimant's attorney proposed an additional limitation

> to the vocational expert, which limited the claimant to only occasional handling, fingering and feeling. As the above discussion illustrates, the undersigned finds that the available evidence does not support such a limitation. Nevertheless, the undersigned notes that the vocational expert testified that even with such a limitation the claimant would be able to perform the positions of table worker and order clerk.

(R. at 22.) Given that, the undersigned finds that even if the ALJ erred, such error would not have changed his determination that Plaintiff was not disabled.

In sum, the undersigned finds that the ALJ did not err by assigning little weight to the specific portions of the opinions given by PT DiBacco, Dr. Sabio, and the State agency physicians as discussed above. Furthermore, even assuming *arguendo* that the ALJ did err, the undersigned concludes that such error was harmless as it would not have affected the overall decision. Accordingly, the undersigned finds that substantial evidence supports the ALJ's finding that Plaintiff was not entitled to DIB.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert.

denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___14___ day of _August_, 2014.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE